Omaha Police Union Local 101, IUPA, AFL-CIO,
also known as Omaha Police Officers Association,
appellee and cross-appellant, v. City of Omaha,
a municipal corporation, appellant
and cross-appellee.

___ N.W.2d ___

Filed December 31, 2015.    No. S-14-1153.

1. **Contracts: Appeal and Error.** The interpretation of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.

2. **Trial: Witnesses: Judgments: Appeal and Error.** A trial court's factual findings in a bench trial of an action at law have the effect of a jury verdict and will not be set aside unless clearly erroneous. The trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony.

3. **Equity: Appeal and Error.** In an appeal in equity, the reviewing court tries factual questions de novo on the record.

4. ____: ____. On appeal from an equity action, when credible evidence is in conflict on material issues of fact, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.

5. **Estoppel: Words and Phrases.** Equitable estoppel is a bar which precludes a party from denying or asserting anything to the contrary of those matters established as the truth by his or her own deeds, acts, or representations.

6. **Equity: Estoppel.** The doctrine of equitable estoppel applies where, as a result of conduct of a party upon which another person has in good faith relied to his or her detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed.

  7. **Waiver: Words and Phrases.** A waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right.
  8. **Waiver: Estoppel.** To establish a waiver of a legal right, there must be a clear, unequivocal, and decisive act of a party showing such a purpose, or acts amounting to an estoppel on his or her part.
  9. **Contracts: Waiver: Proof.** A party may prove the waiver of a contract by (1) a party's express declarations manifesting the intent not to claim an advantage or (2) a party's neglecting and failing to act so as to induce the belief that it intended to waive.
  10. **Waiver: Proof.** The party asserting a waiver defense bears the burden of establishing that a clear and unmistakable waiver has occurred.
  11. **Judgments: Equity: Proof.** To be entitled to equitable relief from a judgment, a party must show that the situation is not due to his or her fault, neglect, or carelessness.

Appeal from the District Court for Douglas County: Joseph S. Troia, Judge. Affirmed.

Christopher R. Hedican, of Baird Holm, L.L.P., for appellant.

Michael P. Dowd, of Dowd, Howard & Corrigan, L.L.C., for appellee.

Heavican, C.J., Wright, Connolly, McCormack, Cassel, and Stacy, JJ.

Wright, J.

## NATURE OF CASE

The appellee and cross-appellant, the Omaha Police Union Local 101, IUPA, AFL-CIO, also known as the Omaha Police Officers Association (Union), filed a declaratory judgment action against the appellant and cross-appellee, City of Omaha (City). The Union requested the district court declare that the collective bargaining agreement between the Union and the City had rolled over to the 2014 calendar year. The Union claimed that the City did not timely provide written notice of its intent to negotiate or modify the terms of the contract for 2014. The City argued that the Union's action was barred by the doctrines of waiver and equitable estoppel. It claimed

written notice was waived by the Union or the Union was estopped from asserting that the City was required to give written notice of its intent to negotiate changes to the contract. We affirm the order of the district court granting declaratory judgment to the Union and denying its request for attorney fees.

## SCOPE OF REVIEW

[1,2] The interpretation of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below. *Gaver v. Schneider's O.K. Tire Co.*, 289 Neb. 491, 856 N.W.2d 121 (2014). A trial court's factual findings in a bench trial of an action at law have the effect of a jury verdict and will not be set aside unless clearly erroneous. The trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. See *Stauffer v. Benson*, 288 Neb. 683, 850 N.W.2d 759 (2014). This case hinges on the applicability of the City's equitable defenses, and we consider the facts de novo on the record. See *Estate of McElwee v. Omaha Transit Auth.*, 266 Neb. 317, 664 N.W.2d 461 (2003).

## FACTS

The parties entered into an agreement which was to remain in effect from December 14, 2008, until December 21, 2013 (Contract). The Contract contained an "evergreen clause" (Article 47), which provided for an automatic extension of the Contract if neither party notified the other of a desire to modify or renegotiate any portion thereof. Article 47 provided:

> This Agreement shall be and shall remain in full force and effect from and after . . . <u>December 14, 2008</u>, until . . . <u>December 21, 2013</u>, and thereafter for successive one (1) calendar year periods, unless one of the parties hereto on or before April 1st of any such year shall notify the other party hereto in writing of its desire to modify the same, or any part thereof.

Neither party disputes that Article 47 required written notice of intent to negotiate changes by April 1, 2014, and that notice was not provided by either party by that date. Consequently, whether the district court erred in granting declaratory relief depends upon whether it erred in rejecting the City's equitable defenses.

The City's argument concerns a series of exchanges between the lead negotiators of the parties which occurred before and after April 1, 2014. The first exchange between the parties was a meeting on February 27. Attorney Mark McQueen, the chief negotiator for the City, contacted Sgt. John Wells, the president and lead negotiator of the Union, to set up a meeting. The purpose of the meeting was to discuss negotiation style and topics for negotiation. During the meeting, McQueen discussed the City's objectives for negotiating the Contract and identified three specific topics which required discussion.

At this meeting, Wells expressed the Union's desire to allow the Contract to roll over in its entirety. The City characterizes this as an "offer" on behalf of the Union to allow the Contract to roll over. McQueen said that he would relay the "offer" to decisionmakers and get back to Wells. McQueen conveyed the Union's desire to allow the Contract to roll over to the City's mayor and the city council's law committee at its next meeting.

In contrast to McQueen's explanation of the February 27, 2014, exchange, Wells described the meeting as an informal meeting to develop a working relationship for future negotiations. Neither party mentioned written notice at the meeting.

The next contact was a brief telephone call on March 19, 2014. McQueen informed Wells that the City wanted to discuss three items: (1) the deferred option retirement plan, which the parties refer to as "DROP"; (2) police cruisers' being taken home; and (3) a pension contribution by the Union of $400,000. Wells indicated that he would relay the information to the Union's executive board and get back to McQueen. McQueen testified that he understood his statements to Wells

during this telephone call to be a counteroffer to an initial offer by the Union to allow the Contract to roll over. Wells did not mention written notice in this call. There was no further contact between the Union and the City before April 1.

The next exchange was a breakfast meeting on April 11, 2014, to discuss rules and procedures for future negotiations. The three items from the March 19 telephone call were discussed. The City claimed that it understood this discussion to pertain to the 2014 calendar year, whereas the Union claimed these discussions were to create a workable atmosphere for negotiations for the 2015 calendar year. At this meeting, Wells requested written notice to open negotiations, but did not specify the year to which those negotiations pertained.

The next contact was a telephone call on April 16, 2014, wherein McQueen informed Wells that he had heard from a fire union official that Wells had made comments regarding the City's failure to provide written notice. The parties did not agree as to what statements were made during this conversation. McQueen testified that Wells reassured him that there must have been a misunderstanding and that the Union was not going to take the position that a rollover had occurred. Wells testified that he never gave McQueen such assurances, but also did not expressly state to McQueen that the Union did, in fact, intend to invoke Article 47 to impose a rollover of the Contract in its entirety for 2014.

On April 17, 2014, the City sent written notice via e-mail to open negotiations. Wells informed McQueen that this language was acceptable. This communication did not identify 2014 as the year for which the Contract was being negotiated. The following day, the parties met to discuss rules for negotiation. No mention of negotiations for 2015 was made in the record of this meeting. The Union did not express its position that the Contract had rolled over.

On May 6, 2014, McQueen attended as an observer of a meeting between Wells, certain Union officers, and the chief and deputy chief of police. At some point during the meeting, the issue of taking police cruisers home arose.

McQueen interjected that the City could implement that change unilaterally.

Following this meeting, on May 15, 2014, the Union sent the City a letter that the Contract had rolled over for the 2014 calendar year. This was the first time that the Union conveyed its position definitively to the City. The Union claimed that all negotiations were for 2015 and that any changes to the Contract for 2014 would require a memorandum of understanding agreed to by both parties. The City claimed that the exchanges beginning on February 27 were negotiations for changes to the Contract and that both parties understood these negotiations to be in regard to the 2014 calendar year. It claimed that in the past, the City had conducted such negotiations without written notice.

The Union filed a complaint against the City pursuant to the Uniform Declaratory Judgments Act, Neb. Rev. Stat. § 25-21,149 et seq. (Reissue 2008). It requested that the district court construe Article 47 to extend the Contract through the 2014 calendar year and declare the rights and duties of the parties. The Union claimed that the language of the Contract provided a binding date for exchange of written notice to commence negotiations. The Union also claimed that the City had engaged in bad faith and requested attorney fees pursuant to Neb. Rev. Stat. § 25-824 (Reissue 2008).

In its answer, the City asserted the defenses of equitable estoppel and waiver. It claimed that the Union was estopped to assert that the City did not provide written notice because of statements made by Wells which led the City to believe such written notice was not required. Additionally, the City claimed that the Union had waived any such written notice requirements by engaging in negotiations both before and after April 1, 2014.

The City filed a counterclaim asserting that if the district court agreed with the Union's position, then the Contract had also rolled forward to the end of 2015. It claimed that the language of Article 47 required written notice by April 1 of

the year prior to whichever year was being modified. Thus, it claimed that written notice was required by April 1, 2013, to negotiate for 2014, and by April 1, 2014, to negotiate for 2015. It claimed that if the court found that the Contract rolled over for the 2014 calendar year, it must also find that it rolled forward for the 2015 calendar year.

The district court rejected the City's equitable defenses. It also rejected the City's interpretation regarding Article 47 that would require written notice to be provided by April 1 of the year prior to the year being negotiated. It found that in order to negotiate for the 2014 calendar year, written notice was required by April 1, 2014.

In rejecting the City's estoppel defense, the court reasoned that the City could not have detrimentally relied upon the Union's conduct in failing to provide written notice of intent to negotiate. In the City's pleadings and in the testimony of McQueen, the mayor, and the City's labor relations director, the City showed its understanding of Article 47 was that written notice was required by April 1, 2013—not April 1, 2014—to prevent a rollover through 2014. Thus, at all operative times, the City believed that the Contract had already rolled over in its entirety pursuant to Article 47. Moreover, the court found that the Union did not make a clear and unmistakable waiver of Article 47.

The district court denied the Union's request for attorney fees. The parties timely appealed.

## ASSIGNMENTS OF ERROR

The City assigns, consolidated and restated, that the district court erred in granting declaratory relief to the Union and in denying the City's equitable defenses. In its cross-appeal, the Union claims that the district court erred in denying its request for attorney fees.

## ANALYSIS

We consider whether the district court erred in granting judgment to the Union and in rejecting the City's equitable

defenses of waiver and estoppel. The parties do not dispute that Article 47 required written notice of intent to open negotiations by April 1, 2014, to prevent an automatic rollover and that neither party provided such written notice by that date. The issue is whether the Union was estopped to assert the provision of Article 47 or whether the Union waived the requirement of Article 47.

[3,4] In an appeal in equity, the reviewing court tries factual questions de novo on the record. See *State ex rel. Dept. of Health v. Jeffrey*, 247 Neb. 100, 525 N.W.2d 193 (1994). On appeal from an equity action, when credible evidence is in conflict on material issues of fact, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Twin Towers Condo. Assn. v. Bel Fury Invest. Group*, 290 Neb. 329, 860 N.W.2d 147 (2015).

The City argues that because the district court did not make specific findings regarding the credibility of the witnesses, there is no factual determination to which this court may give weight. This argument mischaracterizes the district court's ruling. In determining whether the Union's conduct constituted a waiver of Article 47 or whether the doctrine of equitable estoppel applied, the court necessarily relied upon the testimony of the witnesses. The exchanges between the parties were either face-to-face or via telephone conversations, and the court considered testimony from the witnesses to discern what transpired during those conversations. Moreover, the witnesses typically gave differing characterizations of the exchanges. Therefore, in reaching its conclusions, the court determined the credibility of the witnesses and accepted one version of the facts over another.

The City claims that declaratory judgment should have been denied, because the Union participated in negotiations both before and after April 1, 2014, and was therefore estopped to claim the City failed to provide written notice or the Union waived the requirements of Article 47.

Equitable Estoppel

[5,6] Equitable estoppel is a bar which precludes a party from denying or asserting anything to the contrary of those matters established as the truth by his or her own deeds, acts, or representations. *Berrington Corp. v. State*, 277 Neb. 765, 765 N.W.2d 448 (2009). The doctrine applies where, as a result of conduct of a party upon which another person has in good faith relied to his or her detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed. *Burns v. Nielsen*, 273 Neb. 724, 732 N.W.2d 640 (2007).

The elements of equitable estoppel are, as to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. *Farmington Woods Homeowners Assn. v. Wolf*, 284 Neb. 280, 817 N.W.2d 758 (2012). As to the other party, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his or her injury, detriment, or prejudice. *Id*.

The City argues that the Union is estopped from asserting the City's noncompliance with Article 47, because the Union engaged in negotiations to modify the Contract for 2014 both before and after April 1, 2014, and asked for written notice only after the deadline had passed. It claims the Union's conduct induced the City into believing that the Union would engage in negotiations without written notice and that, therefore, the City did not provide written notice as a result.

The evidence showed that Wells told the City that the Union intended to "stand by" the Contract and that it desired the Contract to roll over. Moreover, the City understood Article 47 to require written notice by April 1, 2013, to prevent a roll-over for the 2014 calendar year. Therefore, the City could not have relied to its detriment on the Union's actions beginning in February 2014, in which it stated that it wanted the Contract to extend through 2014.

There was considerable disagreement between the parties concerning the exchanges between Wells and McQueen. Both parties characterize the conversations differently. However, even accepting the City's characterization of the facts, it has not shown that it reasonably relied to its detriment on the Union's conduct in allowing the April 1, 2014, deadline to pass.

The City asserted in its counterclaim that Article 47 required that either party must give written notice of intent to modify the contract on or before April 1 of the year during which the contract expires. According to this interpretation, to open negotiations for the 2014 calendar year, a party was obligated to notify the other in writing of the desire to modify the Contract prior to April 1, 2013. McQueen, the mayor, and the City's labor relations director all interpreted Article 47 in this manner. Consequently, the City believed that the time to provide written notice to open negotiations for 2014 had expired 11 months before the initial exchange at the meeting on February 27, 2014, and more than a year before the City provided written notice on April 17, 2014.

The district court rejected the City's interpretation and held that the deadline to provide written notice to negotiate for the 2014 calendar year was April 1, 2014. Because the City, as shown by its pleadings and witness testimony, believed that written notice for the 2014 calendar year had to be given by April 1, 2013, the trial court did not err in concluding that the City could not have detrimentally relied on Wells' statements during the meeting on February 27, 2014, or in the March 19 telephone call.

The City claims that Wells did not inform McQueen prior to April 1, 2014, that the Union desired written notice to prevent the operative effect of Article 47. It suggests that this inaction was deceptive in that it led the City to believe such requirement had been waived. We reject this argument. Wells was not under a duty to disclose the requirements of Article 47. Declining to expressly request that the City follow the terms of Article 47 did not amount to a misrepresentation. At the February 27 meeting, the Union informed the City that it wanted the Contract to extend for another year. And at that time, the City believed the time to provide written notice to negotiate for 2014 had expired. We conclude that the City has failed to establish the required elements of equitable estoppel.

### WAIVER OF ARTICLE 47

We next consider whether the Union waived Article 47. The City argues that the Union, through its conduct, waived the requirement of written notice to open negotiations. It claims that the parties engaged in negotiations before and after April 1, 2014, and that each party understood the negotiations to be in regard to the 2014 calendar year. The Union asserts that it did not clearly and unmistakably waive Article 47.

[7-10] A waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right. *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010). To establish a waiver of a legal right, there must be a clear, unequivocal, and decisive act of a party showing such a purpose, or acts amounting to an estoppel on his or her part. *State ex rel. Wagner v. Amwest Surety Ins. Co.*, 280 Neb. 729, 790 N.W.2d 866 (2010). A party may prove the waiver of a contract by (1) a party's express declarations manifesting the intent not to claim an advantage or (2) a party's neglecting and failing to act so as to induce the belief that it intended to waive. *D & S Realty v. Markel Ins. Co.*, 280 Neb. 567, 789 N.W.2d 1 (2010). The party asserting a waiver defense bears the

burden of establishing that a clear and unmistakable waiver has occurred. See *Hogelin v. City of Columbus*, 274 Neb. 453, 741 N.W.2d 617 (2007).

The City argues that the parties were negotiating despite neither having provided the other with written notice and that, therefore, the Union had waived Article 47. To support this position, it cites to various points in the testimony of Wells and McQueen to suggest that they both understood the exchanges to be negotiations for 2014.

The Union argues that once the deadline passed, Wells and its negotiators understood the subsequent exchanges to be on a voluntary basis and would require a memorandum of understanding to implement any changes, or pertained to the 2015 calendar year. It claims that it never led the City to believe written notice was not required. The district court found that the Union did not wish to renegotiate the Contract for 2014, but would agree to a memorandum of understanding with respect to the "take home car" issue.

Although the parties focus much on the events after April 1, 2014, our decision hinges on the two exchanges prior to April 1. These exchanges occurred in a face-to-face meeting on February 27 and in a brief telephone conversation on March 19. The City inferred that these exchanges negated the written notice requirement of Article 47. We consider the subsequent exchanges between the parties only to the extent that they demonstrate whether Article 47 was clearly and unmistakably waived in either of the meetings prior to April 1.

The parties agree that during the February meeting, Wells conveyed to McQueen the Union's desire to allow the Contract to roll over in its entirety by neither party sending notice. The City claims that this was an "offer" which commenced negotiations. However, in a meeting between the parties on May 18, 2014, McQueen refers to this as a "suggestion" to roll the Contract over, which surprised McQueen.

Whether the City refers to this communication as an "offer" or an expression of the Union's desire, it did not have the effect of clearly and unmistakably waiving the requirements

of Article 47. A waiver would be against the interest of the Union, which wanted the Contract to extend through 2014. Moreover, Wells informed McQueen that he was unable to agree to anything without review from his executive board. Thus, beyond his communication of the Union's position that it desired the contract to extend through 2014, Wells did not suggest at the February meeting that the Union had waived Article 47. It would be absurd to hold that the Union's expression of its desire to allow the Contract to roll over was, in fact, a waiver of Article 47's operative effect. Nor does the record support that such "offer" was intended to lull the City into inaction.

The only other contact between the parties prior to April 1, 2014, was on March 19. This was a brief telephone conversation between Wells and McQueen. Wells and McQueen testified this conversation was in response to the February discussion. The conversation occurred while Wells was at an airport and picking up his luggage. Wells stated that McQueen informed him that the City would allow a rollover if they could discuss the three issues (take-home cars, the interest rate of the DROP program, and additional pension contribution).

Although McQueen testified that this was a "counteroffer" and that its conditions must be met for the City to otherwise allow the remainder of the Contract to roll over, the City did not memorialize or confirm this communication in a subsequent writing. For the sake of recordkeeping, this is inexplicable. McQueen testified he understood the exchanges to this point to be that the Union offered to allow a rollover and that the City counteroffered for the three conditions.

Wells testified he understood McQueen's statements to mean that the City desired some changes to allow a rollover. He again stated to McQueen that he could not agree unilaterally to anything and that any change would need to be approved through the executive board. He did not expressly state that the Union had waived or intended to waive Article 47.

Beyond McQueen's testimony regarding this brief telephone conversation, we find no indication in the record that the

Union clearly and unmistakably waived Article 47. On the contrary, it appears that such unilateral waiver would have exceeded Wells' negotiating authority and been detrimental to the Union's intent to allow the Contract to roll over in its entirety. The record including the telephone call does not establish that the Union waived the required written notice.

The next meeting between the parties was on April 11, 2014, 10 days after the deadline to provide written notice had passed. The parties discussed the three issues which McQueen brought to Wells' attention in the March 19 telephone conversation. The parties also discussed rules and protocol for negotiations. Wells provided McQueen a copy of what had been used in prior negotiations. Neither party stated to what year these rules and protocols would apply.

Later that day, McQueen had a conversation with a fire union official who informed him that Wells told the fire union official that the City had made a serious mistake by not sending written notice. In an April 16, 2014, conversation between Wells and McQueen, Wells did not specifically tell McQueen that the Union intended to take the position that the Contract had rolled over.

On April 17, 2014, written notice was sent by McQueen and accepted by Wells. Inexplicably, neither party specified the year to which the notice applied. The parties met the following day. The minutes of that meeting do not state which year the parties were discussing, nor do they discuss the Contract rollover or Article 47. The minutes indicate that the parties discussed only the three issues McQueen raised on March 19. Both Wells and McQueen signed off on the minutes. In an April 18 e-mail, Wells stated: "We are getting underway on our negotiations with the City. . . . We are discussing some unresolved issues before we get started on overall negotiations." Again, there is no reference to a year for which the parties were negotiating.

On May 6, 2014, the parties met to discuss the issues, but again did not specify the year. The Union did not expressly

communicate that the Contract had rolled over, nor did it expressly waive Article 47. Nor did the City state its position that the Union had waived Article 47 and that the parties were negotiating for the 2014 calendar year.

We conclude that the City did not meet its burden to show the Union waived Article 47 regarding the 2014 calendar year. Undoubtedly, the exchanges between Wells and McQueen led to ambiguity and misunderstanding between the parties, but ambiguity is not the standard for waiver of a contractual right. The purported waiver must be clear and unmistakable. The record does not show that the Union's conduct rose to the level of a waiver of Article 47.

Nor did the Union's conduct in tacitly allowing the City to fail to meet the deadline to provide written notice amount to a waiver of such written notice. Wells had no duty to inform McQueen that the Union required written notice to open negotiations. The plain language of Article 47 served that purpose. And we find no indication that the Union's conduct induced the City into believing that the Union had waived the written notice requirement.

Further foreclosing on the City's argument that the Union's conduct waived Article 47 was the City's belief, nearly a year prior to the initial meeting between Wells and McQueen, that the Contract was extended through 2014. Based on the City's understanding of Article 47, the City should have believed that the Union was negotiating for 2015. If the City interpreted Article 47 to require written notice by April 1, 2013, to open negotiations for 2014, by the time it issued its "counteroffer" to the Union on March 19, 2014, the supposed deadline had been expired for nearly a year. It would be unreasonable for the City to believe that the Union waived Article 47 nearly a year after April 1, 2013, despite the Union's express statement that it wanted the Contract to roll over to 2014.

In support of its waiver defense, the City relied upon *Hornig v. Martel Lift Systems*, 258 Neb. 764, 606 N.W.2d 764 (2000). In that case, we affirmed a district court's order vacating the

dismissal of an action and reinstating it under the court's inherent equitable authority. The action had been dismissed on April 1, 1997. In January 1998, the appellants refused to stipulate to a reinstatement. The appellants argued that the appellees failed to exercise due diligence in seeking reinstatement and, therefore, were not entitled to reinstatement. However, we noted the appellees had continued to participate in discovery, including participating in depositions and sending substantial amounts of materials to the appellees. Moreover, it rescheduled the deposition of its own expert numerous times. In January 1998, the appellants' counsel took advantage of the situation which he helped create by refusing to stipulate to reinstatement.

We concluded that although the appellees' counsel perhaps should have been more zealous, we could not condone the appellants' apparent strategy of "I gotcha." We held: "When the equities are balanced in this case, it is clear that appellants' 'I go[t]cha' tactic entitled the [appellees] to equitable relief. To conclude otherwise would be to reward appellants for taking advantage of a situation which they helped create." *Id.* at 775, 606 N.W.2d at 772. Given the appellants' conduct, we found that it was reasonable for the appellees to believe the appellants would stipulate to a reinstatement. Thus, we concluded that the appellants' conduct prevented them from benefiting under the maxim that "equity aids the diligent, not those who sleep on their rights." *Id.* at 771, 606 N.W.2d at 770.

We do not find the case at bar to be analogous to *Hornig*. Whereas in *Hornig*, the appellants' sustained participation in extensive discovery was unequivocally inconsistent with a position that it would not stipulate to a reinstatement of the case, we find no such conduct here. The clear and unmistakable conduct in *Hornig* clearly lulled the appellees into repose on diligently and timely seeking such reinstatement. Here, the City could not have been reasonably lulled into repose by the Union's expression on February 27, 2014, that it intended to allow the Contract to roll over. Nor do we find that McQueen's

oral "counteroffer" during the telephone call on March 19 could have reasonably led the City to believe the Union was waiving Article 47. The record shows none of the unequivocal and documented conduct that existed in *Hornig*.

[11] To be entitled to equitable relief from a judgment, a party must show that the situation is not due to his or her fault, neglect, or carelessness. *State on behalf of L.L.B. v. Hill*, 268 Neb. 355, 682 N.W.2d 709 (2004). In this case, neither party clearly expressed its statements in the meetings and communications prior to May 15, 2014. By including Article 47 in the Contract, the parties intended to prevent ambiguity concerning one party's intentions by requiring written notice. As the party desiring to modify the Contract, the City had the duty to provide such written notice. The record does not show that the conversations between Wells and McQueen prior to April 1 justified the City's belief that it did not need to comply with Article 47. The Union's stated intention was to allow the Contract to extend for another year.

## ATTORNEY FEES

Finally, we conclude that the district court did not abuse its discretion in ordering the parties to pay their own attorney fees. The City failed to meet its burden of showing its equitable defenses. But the City's interpretation of the Union's conduct was not so wholly without merit as to be frivolous or in bad faith.

## CONCLUSION

For the reasons stated above, we affirm the order of the district court granting declaratory judgment to the Union and ordering the parties to pay their own attorney fees.

AFFIRMED.

MILLER-LERMAN, J., not participating.